## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK APPLE iPHONE WITH A TAN AND CLEAR CASE LOCATED AT THE HSI PENSACOLA FIELD OFFICE | Case No. 3:25mj94/ZCB |

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR
### A WARRANT TO SEARCH AND SEIZE

I, Christopher Boland, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device —which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Beginning in January of 2017, I attended a 28-week ATF academy in Glynco, Georgia, that certified me as an ATF Special Agent. Prior to that, I graduated from American Military University with a bachelor's degree in Homeland Security. I was previously employed as a protective security specialist

working for a private military company and before as an enlisted member of the United States Marine Corps.

3.      Throughout my training as a Special Agent with the ATF, I was trained to conduct physical surveillance, interview sources of information and defendants, serve and review telephone subpoenas, serve search warrants and arrest warrants, investigate firearms and narcotics trafficking as well as National Firearms Act (NFA) violations and Hobbs Act violations, conduct undercover firearms and narcotic investigations, and review the interception of wire communications. Further, I have been trained to testify in judicial proceedings in federal court involving prosecutions relating to violations of federal firearms laws, as well as federal narcotics law. I routinely refer to and utilize these laws and regulations during my official duties. I have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substance and of the laundering and concealing of proceeds from drug trafficking. I have received training in investigations involving transporting and distributing controlled substances. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of telephones, and their use of numerical codes and code words to conduct their transactions. I am an investigative or law

2

enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.    I have conducted numerous analyses of telephone-billing records for telephones used by narcotics traffickers and gang members.  Consequently, I am familiar with the ways in which gang members, drug traffickers, and others engaged in criminal activity operate their illegal enterprises.  I know that gang members frequently use cellular telephones subscribed in false names.  The use of telephones in this manner is designed to help avoid detection by law enforcement.

5.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.    The property to be searched is a black Apple iPhone with a tan and clear case, hereinafter the "TARGET DEVICE," as more particularly described in Attachment A. The TARGET DEVICE is currently located at the Homeland Security Investigations (HSI) Pensacola Field Office, 880 N Reus St, Pensacola, Florida.

7.    The applied-for warrant would authorize the forensic examination of the TARGET DEVICE for the purpose of identifying electronically stored data for

evidence of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and distribution of a controlled substance, in violation of 21 U.S.C. § 841, as more particularly described in Attachment B.

## OVERVIEW

8.      On two separate dates in February 2025, a confidential source (CS) purchased amounts of methamphetamine from 2728 W Maxwell St, Pensacola, Florida (TARGET ADDRESS). Both narcotics transactions were arranged by Austin James MCCASTLER II (hereinafter MCCASTLER II) via a suspected cellular telephone.

9.      On March 7, 2025, the Drug Enforcement Administration (DEA) and the Escambia County Sheriff's Office (ECSO) executed a judicially authorized search warrant at the TARGET ADDRESS following the controlled purchases.

10.     During the execution of the warrant, MCCASTLER II fired shots at a DEA Special Agent (SA). MCCASTLER II also barricaded himself inside the residence for a short time before fleeing out the front door on foot. MCCASTLER II was then able to get into a Dodge Durango parked near the front porch, and he fled the scene. A short vehicle pursuit ensued with law enforcement giving chase. MCCASTLER II was taken into custody after his vehicle was disabled, a short foot pursuit was undertaken, and MCCASTLER II was thereafter tased.

4

**PROBABLE CAUSE**

11.    In February 2025, a confidential source (CS) purchased amounts of methamphetamine from the TARGET ADDRESS. Both narcotics transactions were arranged by MCCASTLER II via voice and/or text messaging on MCCASTLER's cellular telephone.

12.    During the first transaction, MCCASTLER II was not home when the CS arrived at the TARGET ADDRESS. Soon after, MCCASTLER II arrived driving a gold Dodge Durango. MCCASTLER II contacted the CS and discussed narcotics sales before MCCASTLER II entered the TARGET ADDRESS. MCCASTLER II exited the TARGET ADDRESS a short time later and completed the transaction by providing the CS approximately 10.5 grams of methamphetamine in exchange for United States Currency (USC).

13.    The second narcotics transaction was also arranged between MCCASTLER II and the CS.  MCCASTLER II directed the CS to the TARGET ADDRESS and, upon arrival, the CS noticed the Dodge Durango was not there. MCCASTLER II's live in girlfriend and mother to his child, April BONNER (BONNER), walked out from the residence and provided the CS with approximately 11 grams of methamphetamine for a pre-arranged amount of USC.

14.    On March 7, 2025, federal, state, and local law enforcement officers (LEO) conducted knock and announcements at the front of the TARGET ADDRESS

pursuant to a lawful search warrant. This included the use of a public address system (PA), which was utilized by law enforcement to announce the presence of the Sheriff's Office and the Drug Enforcement Administration multiple times. After approximately one minute, without receiving a response from the occupants of the TARGET ADDRESS, LEO conducted forced entry of the front door. As the door opened, LEO were able to see a juvenile male on the couch to the right, and a female holding an infant and exiting a bathroom to the left. LEO gave verbal commands for the individuals inside to exit. During this time, LEO heard what is described as a muffled gunshot (GUNSHOT #1). Immediately thereafter, the female (holding the infant) and three juveniles exited the residence in an expedited manner. The entry/arrest team entered the front room of the residence again announcing law enforcement's presence. MCCASTLER II could be heard yelling from a back room. LEO continued to announce, "This is the police," or words to that effect. MCCASTLER II stated, "I am locked and loaded! Get out of my house," or words to that effect. He then started to come out through the doorway but witnessed law enforcement and then retreated out of view. LEO believed MCCASTLER II to be armed and now barricaded. LEO began to exit the residence when another gunshot was heard from the back bedroom of the TARGET ADDRESS (GUNSHOT #2). MCCASTLER was the only one present inside the residence at this time.

6

15.    As the initial announcements were being made at the front of the house, a DEA SA in the backyard witnessed MCCASTLER II, wearing red clothing, in the back bedroom window looking out at him.  The DEA SA was clearly marked in his DEA tactical vest and gear.  The SA addressed MCCASTLER II stating, "police with a warrant, go to the front of the house," or words to that effect.  MCCASTLER II then disappeared into the house. Seconds later, the SA witnessed the back door of the residence open, close, and open again before hearing a gunshot (GUNSHOT #1) and seeing a cloud of dirt flying into the air within a few feet of the SA. MCCASTLER II had shot at the SA.

16.    Just seconds after the first gunshot, a member of the perimeter team witnessed MCCASTLER II open the side door facing west on North V Street. MCCASTLER II was wearing red shorts and a red t-shirt. When MCCASTLER II witnessed the LEO, he immediately closed the door.  As the perimeter units in the rear of the TARGET ADDRESS pulled back, the second gunshot (GUNSHOT #2) was heard from inside the residence.  LEO established a covered perimeter. Deputies then again utilized the personal address system in a marked ECSO vehicle to call MCCASTLER II out of the residence.

17.    As these announcements were made, LEO could partially see MCCASTLER II inside the residence.  MCCASTLER II kept his right hand outstretched from body, and his right hand was hidden behind a wall as though he

7

was in possession of something.  MCCASTLER II then got on both knees and showed both hands to the LEO.  MCCASTLER II then disappeared behind the wall. MCCASTLER II conducted this charade multiple times.  Several minutes later, MCCASTLER II closed the front door and began yelling.  MCCASTLER II then reopened the door, again with one arm outstretched and hidden behind the wall. MCCASTLER II yelled to his wife "I love you" and "I am sorry!" MCCASTLER II then closed the door again.  One minute later, MCCASTLER II opened the door with a set of keys on a green lanyard in hand and began to sidestep toward a Dodge Durango in the front yard.  MCCASTLER II entered the passenger side and then quickly entered the driver seat before driving north on North V Street.

18.    ECSO deputies were able to quickly pursue.  Approximately one (1) mile north, at the intersection of West Fairfield Drive and North T Street, deputies conducted a Precision Immobilization Technique (PIT), and the vehicle chase ended. MCCASTLER II exited on foot and a short foot pursuit ensued before MCCASTLER II was tased and arrested on state charges for fleeing and eluding and resisting without violence.

19.    During the foot pursuit, an ECSO Deputy witnessed MCCASTLER II running with a cellular telephone in his hand.  Another deputy thereafter located the cellular telephone on the ground nearby and secured it in one of the marked ECSO vehicles after MCCASTLER II apparently discarded it. On the same date, an ECSO

Narcotics Sergeant transferred the TARGET DEVICE to the ATF Pensacola Field Office. ATF Special Agents then transferred the TARGET DEVICE to the custody of Homeland Security Investigations for secure keeping. Of note, the TARGET DEVICE appears to show an image of MCCASTLER II's face as the wallpaper/lock screen.

20.    During the search of the TARGET ADDRESS, the following items were located, amongst other things:

a.    American Tactical Omni Hybrid, AR-15, 5.56/.223 caliber rifle;

b.    Walther, PPK, .380 caliber pistol;

c.    Assorted live ammunition;

d.    Two .223 spent cartridge casings;

e.    Digital scale;

f.    Multiple baggies of prepackaged narcotics, including suspected marijuana;

g.    Suspected fentanyl pills;

h.    Escambia County Corrections card for Austin MCCASTLER II;

i.    See below images:





21.    Additionally, law enforcement noted and photographed items of drug paraphernalia, including a digital scale with residue, prepackaged narcotics, torn plastic corner baggies, and packaging materials consistent with controlled substances distribution.  At a later time, but prior to appearing in federal court on a criminal complaint, MCCASTLER II admitted to LEO (post *Miranda*) that the TARGET DEVICE was his device.

22.    The American Tactical rifle was located inside the front door of the TARGET ADDRESS, to the right on the floor where MCCASTLER II had been seen last before fleeing. This firearm also matched the caliber of the two (2) fired cartridge casings found inside the residence.  A review of MCCASTLER II's criminal history reveals approximately six (6) previous felony convictions, including, Possession of Cocaine (2007), Fleeing/Elude LEO in Patrol Vehicle (2009), Driving while License Suspended Third (2012), Fleeing/Elude LEO in Patrol Vehicle (2019), Battery on Officer or Firefighter (2020), and Driving while License Suspended Third (2024).

23.    The TARGET DEVICE is currently detained at Homeland Security Investigations.  It came into the ATF's possession following the March 7, 2025, arrest of MCCASTLER II.  The TARGET DEVICE was detained pursuant to the arrest of MCCASTLER II (it also appears to have been abandoned, if MCCASTLER discarded it while fleeing).  In the evening of March 7, 2025, the TARGET DEVICE

was transferred and stored at the HSI Pensacola Field Office where it remains. In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICE first came into the possession of law enforcement.

24.    On March 11, 2025, an arrest warrant by way of criminal complaint was filed in the Northern District of Florida for MCCASTLER II for violations 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 922(g)(1). *See* 3:25mj86/ZCB.

25.    Based on my training and experience, and through conversations with other officers and agents, I know the following:

a.    Narcotics traffickers often utilize cellular telephones to facilitate communication with co-conspirators and/or store telephone numbers/addresses of associates, which MCCASTLER did herein when arranging for the above noted controlled purchases;

b.    Narcotics traffickers maintain records, receipts, notes, ledgers, and other items relating to the transportation, ordering, sale and distribution of controlled substances, which are usually maintained where the traffickers have ready access to them and are often stored on digital media;

c.    Narcotics traffickers commonly maintain addresses or telephone numbers in devices which list names, addresses and/or telephone numbers of their

associates in the trafficking organization; such records are normally maintained within places/things under their control;

       d.    Narcotics traffickers take or cause to be taken photographs of themselves, their associates, their property, and the illegal narcotics they distribute or firearms or U.S. currency they possess, and often maintain these photographs within places/things under their control, including on cellular devices;

       e.    Narcotics traffickers commonly use cellular telephones in order to communicate with their criminal associates and those telephones are commonly carried with them or kept at locations under their custody and control, such as their residences and vehicles, and contain names, numbers and other information stored in the phones; and

       f.    Narcotics traffickers commonly are involved in money laundering and retain records of their transactions within places/things under their control.  Records of this kind are also often stored on digital media.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

27.    *Forensic evidence.*    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence will be on the TARGET DEVICE because:

  a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion

14

is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICE consistent with the warrant.  The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the TARGET DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

29.    *Manner of execution.*  Because this warrant seeks only permission to examine a devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

30.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Christopher Boland
Special Agent
ATF

Subscribed and sworn to before me on March 20 , 2025:

Zachary C. Bolitho
UNITED STATES MAGISTRATE JUDGE